# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

RANDALL RICHARD HOWELL,

      Defendant.

Case No. 26-cr-1001-LTS

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

**Page**

*I.*     *INTRODUCTION*...................................................................................... 2

*II.*    *FINDINGS OF FACT*.............................................................................. 3

*III.*   *DISCUSSION*........................................................................................15

      *A.*     *The Parties' Arguments* ............................................................15

      *B.*     *Relevant Law* ............................................................................18

      *C.*     *Analysis*.....................................................................................22

            *1.*     *Whether the search warrant is supported by probable cause*.........................................................................22

            *2.*     *Whether the* **Leon** *good faith exception applicable* ................28

            *3.*     *Whether Defendant's cellphone is subject to the motion to suppress* .................................................................31

*IV.*   *CONCLUSION*......................................................................................32

1

# I.  INTRODUCTION

On February 24, 2026, the Grand Jury returned an Indictment charging Defendant with one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and (b)(1)(A).  (Doc. 3.)

The matter before me is Defendant's motion to suppress.  (Doc. 27.)  Defendant seeks to suppress all evidence arising from the June 7, 2025 search of Defendant's residence and his person.  Also at issue is the March 10, 2026 search of Defendant's person at the time of his arrest on the instant indictment.  The Government filed a timely resistance.  (Doc. 31.)  The Honorable Leonard T. Strand, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on June 10, 2026.  (Doc. 36.)  On June 12, 2026, Defendant filed a Post-Hearing Brief (Doc. 37) and on June 16, 2026, an Addendum to Post-Hearing Brief (Doc. 38).  On June 22, 2026, the Government filed a Supplemental Resistance to Defendant's Motion to Suppress Evidence.  (Doc. 39.)

At the hearing, the Government exhibits were admitted without objection:

1.  Search warrant dated June 7, 2025 (Doc. 34-1);

2.  Incident/Investigation Report (Doc. 31-2); and

3.  Video of Arrest.

The Defendant's Exhibit C, an Incident/Investigation Report, was also admitted without objection.  (Doc. 30-3).

The Government called three witnesses: Dubuque Police Department Investigator Chad Leitzen, Dubuque Co. Sheriff Deputy Adam Williams, and DEA Agent Shawn Glasel.  I found the witnesses credible.

Law enforcement executed a warrant to search Defendant's residence.  The warrant also authorized search of Defendant's person, which search was effected after a traffic stop of Defendant on his motorcycle.  Defendant challenges the probable cause

2

supporting the warrant.  At the hearing, Defendant clarified that he seeks to suppress all the items on a "Property and Evidence Voucher" included as part of Government's Exhibit 1.  Defendant's motion seeks to suppress "all evidence arising from the June 7, 2025 Search Warrant and from the March 10, 2026 seizure of methamphetamine, arising from the illegal June 7, 2025 search warrant."  (Doc. 27 at 2.)  Defendant's motion states he intended to file a separate inventory of items separately, but the docket does not contain such a filing.  At the hearing, Defense counsel clarified that every item he seeks to suppress is shown on the Property and Evidence Voucher shown in Government's Exhibit 1.  (Doc. 34-1).  This inventory includes items such as controlled substances and paraphernalia but does not include his cell phone.  Defendant also seeks to suppress the methamphetamine that was seized during his March 10, 2026, arrest as shown in Exhibit C.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

Inv. Leitzen wrote a warrant application to search Defendant's person and his residence in Dubuque, Iowa.  Because the instant motion challenges the sufficiency of the probable cause, I have reproduced the contents of the probable cause section of the application:

> 1. On February 10, 2016, I, Inv. Chad Leitzen with the Dubuque Drug Task Force (DDTF), spoke to [M.S.] on the phone.  [M.S.] stated he was a regular methamphetamine user but had been clean for about four month [sic] before relapsing about two weeks earlier.  [M.S.] stated he no longer wished to use methamphetamine, but no matter how hard he tried to get away from it, the people he used to get his methamphetamine from would not leave him alone.  [M.S.] believed the only way for him to be able to stop using methamphetamine was to help law enforcement catch his methamphetamine dealers so they would not be able to contact him any

3

longer.  [M.S.] provided information on several methamphetamine dealers. One of the methamphetamine dealers [M.S.] spoke about was Randy Howell aka "Howie" (Randall Richard Howell, DOB: [XX/XX/XXXX] of [XXXX] Washington Street, Dubuque, Iowa 52001). [M.S.] provided the following information about Howell:

> a. Howie lives at [XXXX] Washington Street, Dubuque, Iowa 52001 (hereinafter referred to as **TARGET RESIDENCE**).

> b. Howie has a locked door in his kitchen that leads to the second floor of the residence.  Behind that locked door is where Howie keeps his methamphetamine that is bagged up for sale.

> c. Howie usually has 1-2 ounces of methamphetamine on hand at any given time.

> d. When people go to Howie's house to buy methamphetamine, Howie typically makes them stay for a half hour to an hour before leaving because he does not want it to look like he has a lot of short-term traffic at his house.

2. On September 1, 2020, I conducted a proffer interview with [M.A.] in Dubuque, Iowa.  [M.A.] agreed to talk about people she knew to be involved in the delivery of methamphetamine.  [M.A.] provided information about several people selling methamphetamine including Randall Howell aka "Howie."  [M.A.] provided the following information about Howell:
a. Howell lives in the area of 12th Street and Washington Street in Dubuque.

b. Howell sells about one pound of methamphetamine per week.

c. [M.A.] last bought methamphetamine from Howell about six to eight months prior to this interview.  [M.A.] stated she and Howell do not get along anymore because Howell does not like [M.A.]'s boyfriend.

3. On August 14, 2024, I conducted an interview with [K.K.] (CI #4159). During that interview, [K.K.] provided information about several people who are involved in the distribution of methamphetamine in the Dubuque

area. One of the people [K.K.] talked about was Randall Howell aka "Howie." [K.K.] provided the following information about Howell:

a. Howell gets large quantities of methamphetamine supplied to him by someone from out of state, but she did not know who the supplier was.

b. [K.K.], who was also a large-scale methamphetamine supplier in the Dubuque area at the time, stated Howell would typically get between a quarter pound and a half pound of methamphetamine from her every week.

4. On May 13, 2025, I spoke to a confidential source (CS) and asked CS to tell me about Randall Howell aka "Howie." CS stated Howell lives at **TARGET RESIDENCE** and has been established in the methamphetamine trade in Dubuque for a long time. CS stated Howell has been a "major player for decades." CS believes that Howell is associated with the outlaw motorcycle gang known as the Matadors. CS stated there are motorcycles that frequent Howell's residence quite often.

5. In the middle of May 2025, the United States Drug Enforcement Administration (DEA) in Cedar Rapids, Iowa began conducting an investigation into several people involved in a large-scale methamphetamine distribution operation spanning several cities across Iowa including Dubuque. One of the main targets of the methamphetamine distribution conspiracy is James Young Sherrill, DOB: [XX/XX/XX] of [XXX] 3rd Street, Van Horne, Iowa 52346. As part of the DEA investigation, the DEA has conducted a number of controlled purchases of methamphetamine from Sherrill over the course of the past several months netting approximately 181.4 grams of methamphetamine from Sherrill.

6. As part of the DEA investigation, it was learned that Sherrill likely has a methamphetamine source of supply in Des Moines, Iowa. While conducting surveillance on Sherrill on May 22, 2025, DEA investigators observed Sherrill meet with his source of supply in Des Moines where it is believed that Sherrill acquired a significant quantity of methamphetamine from the source. Sherrill was then surveilled by the DEA as he returned to his residence in Van Horne, Iowa. Once Sherrill returned to his residence, he met with a subject later identified as [D.F.]. When [D.F.] left Sherrill's residence, a traffic stop was conducted on [D.F.]'s vehicle. A probable cause search of [D.F.]'s vehicle yielded approximately 464.5 grams of

5

methamphetamine and approximately 130.5 grams of marijuana. [D.F.] was later questioned and stated he had received the methamphetamine from James Sherrill.

7. As part of the DEA investigation, DEA SA Shawn Glasel contacted me and asked if I knew a person named James Sherrill. I stated that I had recently spoken to confidential informant (CI) #2269 about James Sherrill. CI had been caught by the DDTF with a small quantity of methamphetamine and a small quantity of marijuana and requested to be allowed to cooperate with the DDTF in exchange for possible leniency on those charges. When questioned, CI spoke about several of CI's sources of supply for methamphetamine in Dubuque. One of the sources CI spoke about was a person named [C.A.] ([C.A.], DOB: [XX/XX/XXXX]. CI stated [C.A.] is CI's main source of supply for methamphetamine. CI stated [C.A.]'s methamphetamine supplier is a guy who goes by "Jimmy Sherrill" on Facebook and lives in Van Horne, Iowa. CI stated Sherrill's phone number is 319-299-[XXXX].

8. SA Glasel advised me that Sherrill's phone number is, in fact, 319-299-[XXXX]. SA Glasel advised that, based on phone toll analysis, Sherrill is frequently in communication with two different people in Dubuque, Iowa; one being [C.A.] and the other being Randall Richard Howell, DOB: XX/XX/XXXX] of [XXXX] Washington Street, Dubuque, Iowa 52001. SA Glasel stated that Howell's phone number is 563-495-[XXXX]. A check of the Dubuque Police Department's Records Management System (RMS) revealed that phone number 563-495-[XXXX] does belong to Randall Howell. In RMS, that phone number has been associated with Howell since approximately 2016. I also checked Leads Online for phone number 563-495-[XXXX] which revealed that the phone number is subscribed to Randall Richard Howell of [XXXX] Washington Street, Dubuque, Iowa 52001.

9. On May 16, 2025, DEA SA Jacob Hoch contacted me and asked if I would review City of Dubuque traffic camera footage from the night before (May 15, 2025) for the area near Randall Howell's **TARGET RESIDENCE**. SA Hoch advised that based on the DEA investigation, he believed James Sherrill likely met with Randall Howell at **TARGET RESIDENCE** the night before (May 15, 2025) between 8:28 pm and 9:14 pm to drop off a significant quantity of methamphetamine. SA Hoch stated

6

that Sherrill was driving his blue 1989 Chevy Camaro and he had his girlfriend with him. I reviewed the traffic camera video from May 15, 2025. It should be noted that there is a traffic camera dedicated to the alley directly behind **TARGET RESIDENCE**, however, there is a privacy fence preventing the cameras from being able to see the back of **TARGET RESIDENCE**. The alley and the end of the driveway are clearly visible with the cameras. At 8:28 pm on May 15, 2025, I observed Sherrill's blue Chevy Camaro pull into the alley and turn into the driveway of **TARGET RESIDENCE**. I was able to see that there were two people in the Camaro. Sherrill remained at **TARGET RESIDENCE** for 42 minutes and left at 9:10 pm.

10. On May 23, 2025, SA Glasel contacted me and stated that, based on the DEA investigation, he believed Sherrill was heading to Dubuque to meet with Howell at **TARGET RESIDENCE** to drop off a significant amount of methamphetamine and collect money. He stated Sherill would be driving his blue Chevy Camaro and would probably arrive at **TARGET RESIDENCE** around midnight. On May 24, 2025, at 12: 19 am, I began conducting physical surveillance on the alley to the rear of **TARGET RESIDENCE**. At 12:27 am, I observed Sherrill's blue Chevy Camaro pull into the alley and park in Howell's back driveway. Sherrill was the sole occupant of the vehicle. Sherrill remained at **TARGET RESIDENCE** for 57 minutes and left at 1:24 am.

11. On May 28, 2025, Officer Gary Pape Jr. was conducting surveillance at **TARGET RESIDENCE** at my request. He observed several motorcycles come and go from **TARGET RESIDENCE**. He was able to identify the registered owners of all but one of the motorcycles. I requested that he not conduct a traffic stop on any of the motorcycles at that time.

12. On May 29, 2025, SA Glasel contacted me and stated that, based on the DEA investigation, he believed Sherrill would be transporting another significant quantity of methamphetamine to Howell sometime that evening or early the next morning. SA Glasel did not know exactly when Sherrill would arrive in Dubuque. On May 30, 2025, SA Glasel advised me that Sherrill had driven his black Chevy Silverado to Dubuque during the overnight hours to meet with Howell. I reviewed traffic cameras and observed Sherrill's Chevy Silverado pull into the rear driveway of **TARGET RESIDENCE** at 12: 15 am on May 30, 2025. Sherrill remained

7

at **TARGET RESIDENCE** for one hour and 18 minutes and left at 1:33 am.

13. On June 5, 2025, DDTF Inv. Nick Soppe observed a gold 1991 Honda Accord drive to **TARGET RESIDENCE** and park in the back driveway. The driver, later identified as [H.M.], stayed at **TARGET RESIDENCE** for about an hour before leaving. Once she left the residence, Inv. Soppe conducted a traffic stop on the Honda Accord. [H.M.] was asked to step out of the vehicle so a probable cause search could be conducted on the vehicle. [H.M.] was patted down for weapons. During that weapons pat down, Cpl. Waddick felt what he immediately knew to be consistent with a bag of drugs in [H.M.]'s pocket. He removed the bag and found it to contain 3.95 grams of methamphetamine which later field tested positive for methamphetamine. [H.M.] lied about where she had been for the previous hour and also stated she had gotten the methamphetamine from an unknown person in Clinton, Iowa earlier that day. A check of the Flock automated license plate reader (ALPR) system showed that [H.M.]'s vehicle had not traveled outside of Dubuque or anywhere in Clinton where an ALPR is located on that date.

14. Based on my training and experience, I know that it is common for drug users to try to divert the attention of law enforcement from the actual source of supply to a fictitious source of supply in order to protect the actual source.

15. On June 6, 2025, SA Glasel contacted me and stated that, based on the DEA investigation, he believed Sherrill would be driving to **TARGET RESIDENCE** that night to meet with Howell and drop off methamphetamine. He also believed Sherrill would be collecting money from Howell. SA Glasel advised me that Sherrill would be driving his black BMW to Dubuque to meet with Howell that night.

16. On June 6, 2025, at approximately 9:00 pm, I began conducting surveillance on **TARGET RESIDENCE**. At 11: 14 pm, I observed Sherrill's black BMW arrive and park in the driveway to the rear of **TARGET RESIDENCE**. At that same time the BMW pulled into the driveway, I observed an unidentified white male wearing a white shirt and shorts walk into the driveway of **TARGET RESIDENCE**. That unidentified white male was not observed leaving the residence the rest of

8

the evening.  On June 7, 2025, after being at **TARGET RESIDENCE** for 56 minutes, I observed Sherrill's BMW leave **TARGET RESIDENCE** at 12:10 am.  I discontinued surveillance at 1:00 am.

17. Based on phone toll analysis by the DEA, prior to each of the meetings between Sherrill and Howell (May 15th, May 24th, May 30th, and June 6th), they engaged in phone communication with one another.  It is believed that the communication between the two was coordinate [sic] the meeting to exchange money and/or methamphetamine.

18. Based on information received from [M.S.] in 2016, I know that Howell typically requires people to remain at **TARGET RESIDENCE** for a half hour to an hour when completing a drug deal so it does not look like he has a lot of short-term traffic at **TARGET RESIDENCE**.  During the four aforementioned meetings between Sherrill and Howell at **TARGET RESIDENCE**, Sherrill spent between 42 minutes and 1 hour and 18 minutes at **TARGET RESIDENCE**.  [H.M.] also spent about an hour at **TARGET RESIDENCE** on June 5, 2025 prior to being stopped by law enforcement and being found to be in possession of methamphetamine.

19. I am aware that Sherrill's residence in Van Horne, Iowa is more than an hour and a half drive away from **TARGET RESIDENCE**.  I know it is common for drug dealers to travel under the cover of darkness in order to help conceal their criminal activities.  I also know that it is extremely unlikely that the meetings lasting about an hour or less between Sherrill and Howell in the middle of the night are social visits, especially given that Sherrill has to make a more than three-hour round trip to meet with Howell. I believe it is extremely likely that a drug and/or money exchange took place during each of Sherrill's listed visits to **TARGET RESIDENCE**.

20. Based on my training and experience as well as conversations I have had with other law enforcement officers, I know that subjects who are involved in the distribution of drugs often acquire the drugs in bulk amounts for a relatively cheap price.  Those subjects then break the bulk quantities of drugs down into smaller, personal use amounts which are then sold to drug users for a profit.

21. I know that drug dealers often use digital scales and plastic packaging material to weigh out and package drugs for sale.  Even when there are no

9

drugs present at the drug dealer's residence, the drug paraphernalia used to weigh and package the drugs typically still remains at the residence.

22. I am also aware that many drug dealers are drug users, themselves. I know that methamphetamine is commonly smoked using a glass pipe with a bubble on the end, injected using a syringe, or snorted using some sort of a snort tube, typically a cutoff plastic straw or rolled up dollar bill.

23. Based on the facts gathered during this investigation, I believe there will likely be methamphetamine, drug paraphernalia, and possibly other drugs inside the residence of [XXXX] Washington Street, Dubuque, Iowa 52001 (**TARGET RESIDENCE**) as well as inside the detached garage to the rear of **TARGET RESIDENCE**.

(Doc. 34-1 at 9-14.)

Inv. Leitzen testified at the hearing. He has been a police officer for more than 23 years and a drug task force officer for 13 years. Much of what Inv. Leitzen testified about was included in his search warrant application. Keeping in mind that any additional or different material he testified about at the hearing was not considered by the judge issuing the warrant, I will summarize the other salient points from Inv. Leitzen's testimony:

- Inv. Leitzen was aware that the investigation into James Sherrill included telephone wiretaps of calls which appeared to show Defendant was receiving methamphetamine from Sherrill. (Leitzen Hr'g Test. at 6, 30.)
- There are approximately 1,500 traffic cameras throughout the City of Dubuque, including one pointed toward Defendant's residence which, although partially obscured, allows some observation of vehicle traffic to and from the residence. (*Id.* at 7-8.)
- Regarding the search warrant process, Inv. Leitzen testified that the county attorney reviews and suggests edits which he incorporates before a second review. He testified that he is sworn in over the telephone by a judge and

10

then submits the application electronically through DocuSign. (*Id.* at 9-10.) The county attorney's review of the probable cause statement takes longer than is reflected by the DocuSign timestamps. (*Id.* at 11.)

- Inv. Leitzen had previously written several hundred state search warrants. (*Id.* at 16.) In this case, the county attorney involved was Ted Enger, with whom Inv. Leitzen had previously worked. (*Id.*) Mr. Enger did not make any suggested edits to the warrant. (*Id.* at 21.) Inv. Leitzen testified, "I have had very good luck with Ted Enger, I think he's a thorough attorney, does a very good job." (*Id.* at 16.) Inv. Leitzen shared the same opinion regarding Judge Boleyn, the magistrate[1] who signed the warrant. (*Id.* at 16-17.)

- After the warrant was signed by the magistrate, law enforcement placed surveillance on Defendant's residence while they planned the execution. (*Id.* at 12.) While conducting surveillance, Sgt. Williams conducted a traffic stop after observing Defendant leave the residence on a motorcycle.[2] (*Id.* at 13.)

- Inv. Leitzen recorded the portion of the traffic stop he attended on his body camera. Inv. Leitzen searched Defendant and found four bags of methamphetamine in his pants pocket weighing approximately four grams. (*Id.* at 13-14.) When asked if Defendant had anything else illegal on his person, Defendant admitted he had an ounce of methamphetamine in his jacket pocket. (*Id.* at 14.) Defendant was not arrested and he was searched pursuant to the warrant and not incident to an arrest. (*Id.* at 37)

---

[1] In the Iowa court system, "magistrate" is the appropriate title of the judicial officer in question. Iowa Code § 602.6104.

[2] Sgt. Willams's testimony about the stop is discussed below.

11

- Inv. Leitzen also found Defendant's cellphone which was downloaded by law enforcement and returned later the same day. (*Id.* at 14-15.) Prior to the download, Defendant executed a consent form to permit a search of the phone. (*Id.* at 15.) Inv. Leitzen explained that the search warrant permitted seizure of the phone, but in Dubuque County, a separate search warrant or consent is required to search the contents of a seized phone. (*Id.* at 38.)
- Pages 23-26 of Government's Exhibit 1 document the items seized from Defendant's person or his residence. (*Id.* at 17.)
- When Defendant was arrested on the warrant for the instant indictment, he was found in possession of one gram of methamphetamine. (*Id.* at 19.)
- Inv. Leitzen acknowledged that the information in the warrant application from February 2016 was insufficient to pursue Defendant's arrest at that time. (*Id.* at 22.)
- No charges arose from the information regarding Defendant's possible involvement in drug trafficking in 2016 and 2020. (*Id.* at 22-23.)
- When H.M was stopped after leaving Defendant's residence in June 2025, H.M. was not asked specifically about Defendant and said she had gone to Clinton. (*Id.* at 31.) H.M.'s statement was determined to be a lie based on Flock automated license plate readers that would have made a record of H.M.'s passage, if she had traveled to Clinton. (*Id.* at 32-33.) Law enforcement had not asked whether H.M. had someone else drive H.M. to Clinton.

Next, the Government called Sergeant Adam Williams.[3] Sgt. Williams had been aware of Defendant since 2016. Sgt. Williams knew of no controlled purchases involving

---

[3] Sgt. Williams has been employed by of the Dubuque County Sheriff's Office for 20 years and has been assigned to the Dubuque Drug Task Force since July 2015.

Defendant, but he was aware of the investigation into Sherrill, that there were wiretap calls between Defendant and Sherrill, and that law enforcement believed Defendant had received methamphetamine from Sherrill on June 6, 2025. (Williams Hr'g Test. at 40.)

On June 7, 2025, Sgt. Williams conducted surveillance of Defendant's residence at about 6:00 p.m. in preparation for the execution of the search warrant. (*Id.* at 41.) In his unmarked vehicle, Sgt. Williams followed Defendant when Defendant unexpectedly left his residence on his motorcycle. (*Id.* at 42-43.) At an intersection, Sgt. Williams observed Defendant start into the intersection while the light was still red.[4] (*Id.*) For safety reasons, law enforcement had planned to stop Defendant if he left the residence. (*Id.* at 43.) Sgt. Williams was not initially the person designated to make the stop, but other participants in the warrant execution were occupied at the pre-execution meeting. (*Id.*) When Sgt. Williams stopped Defendant, he told Defendant that the reason for the stop was that he had started into the intersection before the light turned green. (*Id.* at 44.) Sgt. Williams was present for the search of Defendant's person, but he was not involved. (*Id.*) Defendant was permitted to return home on his motorcycle after the search of his person. (*Id.*)

Finally, the Government called to testify Agent Shawn Glasel from the Drug Enforcement Agency. Agent Glasel has been with the DEA since 2024 and was previously in law enforcement in Wisconsin. (Glasel Hr'g Test. at 50.) Agent Glasel was investigating Sherrill, including with the use of wiretaps from May 15 through July 1, 2025. (*Id.* at 50, 57.) Agent Glasel identified Defendant speaking to Sherrill about methamphetamine distribution to Defendant. (*Id.* at 51.) Several calls and text messages indicated that Mr. Sherill would be delivering methamphetamine to Defendant. (*Id.*)

---

[4] Defendant does not challenge the basis for the traffic stop.

The investigation showed that Damon Foster was receiving methamphetamine from Sherrill. (*Id.* at 51-52.) Mr. Foster was stopped after meeting with Sherrill and was found in possession of one pound of methamphetamine and a quarter pound of marijuana. (*Id.* at 52.)

Agent Glasel testified regarding information that was supplied to the Dubuque Drug Task Force as follows:

> Q. And around that same time was Mr. Sherrill in communication with Mr. Howell indicating that Mr. Howell was also going to be receiving methamphetamine?
> A. Yes.
> Q. And did you supply that information regarding Mr. Howell to the Dubuque drug task force?
> A. Yes.
> Q. And specifically on June 6, 2025, did calls and text message interception show that Mr. Howell was going to and did receive methamphetamine from Mr. Sherrill?
> A. On June 6 it was plans between Mr. Sherrill and Mr. Howell for Mr. Sherrill to meet with Mr. Howell, they didn't specifically talk about receiving methamphetamine.
> Q. Based on the prior investigation, did you believe, though, that it was likely that Mr. Sherrill was delivering to him?
> A. Yes.

(*Id.* at 52-53.)

While the warrant application did not mention the wiretap, the calls were known to law enforcement. (*Id.* at 53.) The wiretap information was not included in the warrant application to protect the on-going investigation because law enforcement was concerned the warrant might not be sealed. (*Id.* at 54.) Inv. Leitzen was instructed not to include information about the wiretap in the warrant application to protect the investigation and because of safety concerns. (*Id.* at 56.) Defendant's phone was not subject to the wiretap; however, the calls between Defendant and Sherrill were intercepted from the wiretap of Sherrill's phone. (*Id.* at 55.)

14

# III. DISCUSSION

## A. The Parties' Arguments

Defendant asserts that the search warrant was not supported by probable cause because it relies on stale information from 2016, 2020, and 2024, vague statements from confidential sources, and "ambiguous visits" by a suspected drug dealer. (Doc. 27-1 at 1-2.) Defendant points to the absence of controlled purchases, witnessed transactions, or recent corroboration of drug activity. (*Id.* at 2.) Defendant therefore contends there was not a substantial basis for the issuing judge to find probable cause. Defendant also contends that the *Leon* good faith exception does not save the warrant. (*Id.*)

Defendant asserts that the information from 2016 to 2024 is stale and the information from 2025 is conclusory or fails to corroborate the presence of controlled substances at the residence. Defendant contends the evidence of Sherill at the residence is, while more recent, still not corroborative of storage or distribution of drugs at the residence. (*Id.* at 4-5.)

Defendant also contends that the affidavit in support of the warrant fails to establish a nexus between criminal activity and the residence. Moreover, he alleges that the totality of the circumstances does not establish probable cause. (*Id.* at 5-7.)

In his post-hearing brief, Defendant emphasizes some of the above arguments. In addition, Defendant argues that "mere association" with Sherrill, a known drug dealer, is insufficient to establish a nexus with his residence. (Doc. 37 at 4-5.) Defendant attempts to distinguish *United States v. Randle,* 39 F. 4th 533, 537 (8th Cir. 2022) which found the *Leon* good faith exception applicable. Here, Defendant argues, the instant case lacks explicit, recent evidence of the presence or distribution of narcotics at Defendant's residence. (Doc. 37 at 5.)

Defendant contends that the methamphetamine seized from him was seized pursuant to the warrant and not the result of a traffic stop. Thus, he alleges it is the fruit

of the poisonous tree. Moreover, Defendant argues that his phone seized during the traffic stop was fruit of the poisonous tree and any subsequent consent he may have given does not purge the taint. (*Id.* at 6-8.)

I also note that in his motion, Defendant seeks "an order suppressing all evidence arising from the June 7, 2025 Search Warrant and from the March 10, 2026 seizure of methamphetamine, arising from the illegal June 7, 2025 search warrant." (Doc. 27 at 2.) As the Government points out, Defendant "does not address March 10, 2026, in his brief and he provides no legal support for the suppression of the evidence obtained when he was arrested on the arrest warrant." (Doc. 31-1 at 20.) In his post-hearing brief, Defendant states that he:

> Acknowledges that the evidence arising from the March 10, 2026 arrest will likely be admissible based upon record presented. See Def. Ex. C. However, Defendant does not have Grand Jury Transcripts of testifying fact witnesses and so it is difficult to determine whether the remaining evidence was sufficient to support Indictment. As such, Defendant reserves right to reassert this argument in the event that the Court finds the defective warrant requires suppression.

(Doc. 37 at 8.) For purposes of the instant motion, the Court considers the issue of suppression of methamphetamine seized on March 10, 2026 to be waived.[5]

---

[5] Should the District Court disagree with me about the waiver, the Government correctly argues that as long as the officers arresting Defendant on March 10, 2026 "were acting objectively reasonabl[ly], . . . evidence from the March 10, 2026 arrest should not be suppressed." (Doc. 31-1 at 20.) *See United States v. Teitloff*, 55 F.3d 391, 393 (8th Cir. 1995) (providing that officer acting on the authority of a validly issued arrest warrant, which later was determined to be supported by evidence obtained in violation of the defendant's Fourth Amendment rights, did not require suppression of evidence seized incident to arrest because there was "absolutely no indication that the deputies were not acting in an objectively reasonable manner when they executed the arrest warrant" and "the district court properly admitted the evidence seized incident to [the defendant's] arrest."). While neither party has fully addressed or developed this issue, there is no evidence currently before the Court that the arresting officers were not acting in an objectively reasonable manner when they executed the arrest warrant on Defendant on March

16

The Government counters that the warrant was supported by probable cause. The Government enumerates 13 links between Defendant and criminal activity:

> (1) defendant's involvement with drug trafficking out of his residence was documented as early at 2016; (2) in 2020 defendant was selling a pound of methamphetamine a week while at the same residence he currently resides in; (3) in 2024, defendant was receiving a quarter pound to a pound of methamphetamine; (4) in May 2025, a CS confirmed defendant was a major drug player for decades; (5) officers had conducted a controlled purchase of approximately 181.4 grams of methamphetamine from James Sherrill, Jr. in the past several months; (6) Sherrill was believed to be dealing methamphetamine from his residence in Van Horne and D.M. was stopped after leaving Sherrill's residence with 464.5 grams of methamphetamine and admitted the methamphetamine came from Sherrill; (7) Sherrill was identified as C.A.'s main source and that individual knew Sherrill's number; (8) Sherrill was known to be in frequent contact with C.A. and defendant; (9) Sherrill was observed at defendant's residence on May 16; (10) Sherrill was observed at defendant's residence on May 24 after DEA said that he would be coming to drop off methamphetamine and collecting money; (11) Sherrill was observed at defendant's residence on May 29 after DEA indicated he would be coming to transport more methamphetamine to defendant; (12) H.M. was stopped  after leaving defendant's residence and lied about where she had been after methamphetamine was found on her person; and (13) DEA said Sherrill was coming to defendant's residence to drop off methamphetamine on June 6 and then Sherrill was observed at defendant's residence later that same day.

(Doc. 31-1 at 14-15.)

The Government contends the information relied upon in the warrant application was not stale and provided a sufficient nexus with the residence.  The Government further argues that, if the Court finds the absence of probable cause, the *Leon* good faith exception applies.

---

10, 2026.  Therefore, even if Defendant did not waive this issue, suppression would not be appropriate.

17

The Government contends the methamphetamine seized on March 10, 2026 when he was arrested in the instant case is not the fruit of the poisonous tree. Even if the March 10, 2026 seizure was the fruit of the poisonous tree, the Government argues the officers were acting objectively reasonable when arresting defendant.

In its post-hearing brief (Doc. 39), the Government argues the warrant was supported by probable cause and attempts to distinguish *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000) and *United States v. Randle*, 39 F.4th 533 (8th Cir. 2022) relied upon by the defense. The Government further argues that evidence from the traffic stop is admissible because the warrant was valid and, in addition, it was supported by probable cause from information known to law enforcement. In other words, the Government alleges that even without the warrant, there was reasonable suspicion to make a traffic stop and probable cause to search Defendant. (Doc. 39 at 4-5.) The reasonable suspicion, the Government contends, was based on information in the warrant application and "the DEA was engaged in wiretapping defendant's source's phone proving [sic] additional information beyond what was included in the affidavit." (*Id.* at 5.)

Finally, the Government argues Defendant waived suppression of his phone because it was not listed on his inventory or items he seeks to suppress. The Government further notes that the phone was not listed in the inventory created by the police because it was consensually searched and its contents downloaded. (*Id.* at 6.)

## B. *Relevant Law*

"The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular[ ] descri[ption of] the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Skarda*, 845 F.3d 370, 375 (8th Cir. 2016) (quoting *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994), in turn quoting U.S. Const. amend. IV). "A magistrate judge may issue a search

warrant 'upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)); *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) ("Probable cause is a fair probability that . . . evidence of a crime will be found in the location to be searched") (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996))); *United States v. Mazzulla*, 932 F.3d 1091, 1098 (8th Cir. 2019) ("A supporting affidavit establishes probable cause to issue a search warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched") (quotations omitted)); *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) ("If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established.").

"In assessing whether a warrant is sufficiently particular, [courts] consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (citation omitted). The particularity requirement "is one of 'practical accuracy rather than a hypertechnical one.'" *Id.* (quoting *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the

circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted); *see also United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) ("In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause."). "The Fourth Amendment requires that the issuing 'magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022) (quoting *Gates*, 462 U.S. at 236); *see also United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) ("The role of a reviewing court is to ensure the magistrate issuing the warrant 'had a "substantial basis for concluding that probable cause existed"'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), in turn quoting *United States v. Garcia-Hernandez*, 682 F.3d 767, 771 (8th Cir. 2012))). "When the issuing magistrate relies solely on a supporting affidavit in determining probable cause, . . . 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) (quoting *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020)). "The issuing court's probable cause determination 'should be paid great deference by reviewing courts.'" *Johnson*, 848 F.3d at 876 (quoting *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009)). "Probable cause is 'not a high bar.'" *United States v. Charles*, 125 F.4th 904, 910 (8th Cir. 2025) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

20

The substantial basis standard requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Conclusory statements, however, "made by affiants fail to give the issuing magistrate a substantial basis for determining probable cause exists." *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007). "In addition to probable cause that contraband or evidence of a crime will be found, 'there must [also] be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). This requires "'a "nexus" between the evidence to be seized and the place to be searched, considering "the nature of the crime and the reasonable, logical likelihood of finding useful evidence."'" *Schave*, 55 F.4th at 676 (quoting *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021), in turn quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

Defendant bears the burden of proving the warrant was issued without probable cause. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence") (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)); *United States v. McGuire*, No.

21

CR 13-40058, 2013 WL 5516192, at *3 (D.S.D. Oct. 1, 2013) ("A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause") (quoting *United States v. Sierra–Garcia,* 760 F. Supp. 252, 262 (E.D.N.Y. 1991)), *R. & R. adopted,* 2013 WL 6449893 (D.S.D. Dec. 10, 2013). "In doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982) (quoting *United States v. Christenson*, 549 F.2d 53, 55 (8th Cir. 1977)); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").

## C.     Analysis

### 1.      Whether the search warrant is supported by probable cause

The search warrant was issued by a neutral and detached state court magistrate. The search warrant also provided a particular description of the places to be searched and the things to be seized. Specifically, the search warrant identified the following places and person to be searched: (1) residence of XXXX Washington Street, Dubuque, Iowa; (2) detached garage to the rear of XXXX Washington Street, Dubuque, Iowa; and (3) Defendant's person. (Gov. Ex. 1.) Among the items to be seized, the search warrant included "[a]ny and all controlled substances which are possessed in violation of Chapter 124.401, State Code of Iowa," drug paraphernalia, and "[a] cellular telephone using phone number XXX-XXX-XXXX belonging to [Defendant]." (*Id.*)

Finally, the search warrant affidavit contained the following information pertinent to the magistrate's finding of probable cause: (1) in February 2016, Inv. Leitzen spoke with an informant who identified Defendant as a methamphetamine dealer, noting his

residence and Defendant's practice of having methamphetamine buyer's stay at his home for 30 minutes or more to avoid the appearance of short-term traffic at his house; (2) in September 2020, Inv. Leitzen conducted a proffer interview with M.A. who also identified Defendant as a methamphetamine dealer, also noting Defendant's residence and that he sold about 1 pound of methamphetamine per week; (3) in August 2024, Inv. Leitzen conducted and interview with K.K., a large-scale methamphetamine supplier, who identified Defendant as a methamphetamine dealer and stated that she provided Defendant with between one quarter pound and one half pound of methamphetamine weekly; (4) in May 2025, Inv. Leitzen spoke with a Confidential Source ("CS") who identified Defendant's residence and stated that Defendant had been established in the methamphetamine trade in Dubuque for a long period of time ("decades"); (5) also in May 2025, the DEA began an investigation into James Sherrill and conducted several controlled purchases of methamphetamine from Sherrill amounting to approximately 181 grams of methamphetamine; (6) on May 22, 2025, DEA agents observed Sherrill meet with his source and obtain what agents believed was a large quantity of methamphetamine and later meet with D.F., who after leaving Sherrill's home was stopped by law enforcement and a probable cause search of D.F.'s vehicle yielded approximately 464 grams of methamphetamine which D.F. stated he obtained from Sherrill; (7) a confidential informant ("CI") spoke with Inv. Leitzen and told him that C.A., a methamphetamine dealer in Dubuque, obtained his methamphetamine from Sherrill; (8) the DEA confirmed that Sherrill was in regular contact with C.A. and also noted that Sherrill was in regular contact with Defendant; (9) on May 16, 2025, Inv. Leitzen confirmed for the DEA, using Dubuque camera traffic footage, that Sherrill pulled into the alley behind Defendant's residence and turned into Defendant's driveway at 8:28 p.m. and stayed until 9:10 p.m.; (10) on May 23, 2025 Special Agent Glasel contacted Inv. Leitzen and told Inv. Leitzen that he believed Sherrill planned to meet with Defendant at

23

Defendant's residence and drop off a significant amount of methamphetamine and collect money from Defendant around midnight; (11) on May 24, 2025, at 12:19 a.m., Inv. Leitzen conducted physical surveillance on Defendant's residence and observed Sherill pull into Defendant's driveway at 12:27 a.m. and leave Defendant's residence at 1:24 a.m.; (12) on May 29, 2025, Special Agent Glasel contacted Inv. Leitzen and informed him that Sherrill was expected to drop off a large quantity of methamphetamine to Defendant late that evening or early the next morning, and on May 30, 2025, traffic camera footage showed that Sherrill pulled into to Defendant's rear driveway at 12:15 a.m. and left at 1:33 a.m.; (13) on June 5, 2025, Inv. Nick Soppe of the Dubuque Drug Task Force, observed H.M. at Defendant's residence, where she stayed for about one hour, after leaving Defendant's residence, H.M. was stopped and a bag with 3.95 grams of methamphetamine was found on H.M.'s person; (14) H.M. stated that she obtained the methamphetamine in Clinton, however, the automated license plate reader system showed that H.M. had not left Dubuque or gone anywhere in Clinton on June 5, 2025; (15) Inv. Leitzen noted that in his training and experience drug users often provide inaccurate information to law enforcement when questioned to protect their drug source; (16) on June 6, 2025, the DEA informed Inv. Leitzen that Sherrill would be meeting Defendant at Defendant's residence to drop of methamphetamine and collect money; (17) Inv. Leitzen conducted physical surveillance on Defendant's residence and observed Sherrill pull into Defendant's driveway at 11:14 p.m. and leave at 12:10 a.m.; (18) DEA phone tolls on May 15, May 24, May 30, and June 6, 2025 showed that Defendant and Sherrill engaged in phone communication with each other; and (19) Inv. Leitzen stated that in his training and experience drug dealers often travel at night to conceal their criminal activities and that it is unlikely that meetings lasting an hour or less in the middle of the night are social visits, especially since it is a three hour round trip between

24

Sherrill's home and Defendant's residence, making it "extremely likely" that drugs and/or money were exchanged on each of Sherrill's visits to Defendant's residence.

Considering the information contained in the affidavit outlined above, and bearing in mind that I am to give "great deference" to the issuing judge's probable cause determination, *see Gates*, 462 U.S. at 236, and I am not required to "make a de novo inquiry into the existence of probable cause," *see Hallam*, 407 F.3d at 948, here, the magistrate had a substantial basis and made "a practical and common-sense" determination, based on the totality of the circumstances, *see Kail*, 804 F.2d at 444, that "a search would uncover evidence of wrongdoing." *See Maccani*, 49 F.4th at 1130 (quotation omitted). For these reasons, and as discussed below, I find that the search warrant was supported by probable cause.

Moreover, Defendant's staleness argument lacks merit. "A warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search.'" *United States v. Colbert*, 828 F.3d 718, 727 (8th Cir. 2016) (quoting *United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009), in turn quoting *United States v. Palega*, 556 F.3d 709, 715 (8th Cir. 2009)). "The specific context and nature of the warrant must be examined for each case; '[t]here is no bright-line test for determining when information in a warrant is stale.'" *United States v. Johnson*, 848 F.3d 872, 877 (8th Cir. 2017) (alteration in original) (quoting *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010), in turn quoting *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008)). Factors to consider in determining staleness include "the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021) (quotations omitted). Here, the warrant was issued less than 24 hours after law enforcement had observed Sherrill, a known methamphetamine supplier who

25

had frequent contact with Defendant, at Defendant's residence for the fourth time in less than one month in the middle of the night. Inv. Leitzen stated that:

> l am aware that Sherrill's residence in Van Horne, Iowa is more than an hour and a half drive away from [Defendant's residence]. I know it is common for drug dealers to travel under the cover of darkness in order to help conceal their criminal activities. I also know that it is extremely unlikely that the meetings lasting about an hour or less between Sherrill and [Defendant] in the middle of the night are social visits, especially given that Sherrill has to make a more than three-hour round trip to meet with [Defendant]. I believe it is extremely likely that a drug and/or money exchange took place during each of Sherrill's listed visits to [Defendant's residence].

(Gov. Ex. 1 at 13, ¶ 19.) Law enforcement was investigating a drug conspiracy which the affidavit established. *See Colbert*, 828 F.3d at 727 (finding information from over weeks period of time used to establish probable cause in an ongoing drug conspiracy was not stale); *United States v. LaMorie*, 100 F.3d 547, 554 (8th Cir. 1996) ("Where continuing criminal activity is suspected, the passage of time is less significant."). The information from 2016, 2020, and 2024, which Defendant focuses on, must be taken together with the information from May and June 2025. Providing historical context does not make a warrant affidavit stale when the affidavit also provides and focuses on information relating to an ongoing drug conspiracy over a period of weeks. Based on the foregoing consideration of factors, I find that the search warrant affidavit was not stale.

Defendant's argument that the search warrant affidavit failed to establish a sufficient nexus between the alleged criminal activity (drug dealing) and Defendant's residence also lacks merit. "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *Colbert*, 828 F.3d at 726 (alteration in original) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). "Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *Johnson*,

26

848 F.3d at 878 (quoting *Colbert*, 828 F.3d at 726, in turn quoting *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999)). Defendant maintains that "[t]he recent facts show only that Sherrill (a DEA target) visited Defendant's home several times and they spoke on the phone" and thus "the affidavit simply infers that because Sherrill is a dealer and visited Defendant, drugs or evidence must be there." (Doc. 37 at 4.) Defendant contends that "[t]his is the exact deficiency condemned in" *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000). (*Id.*) In *Herron*, two search warrants were obtained, one for the defendant's residence and one for the defendant's relatives' farm. 215 F.3d at 814. The same affidavits were offered to support both search warrants. *Id.* On appeal, the government conceded that the search warrant for the defendant's residence lacked probable cause. *Id.* The Eighth Circuit noted that:

> The affidavits provide no evidence that there was any illegal activity at the [defendant's] residence and no evidence that [the defendant] ever participated in the cultivation of the marijuana found at the Buck farm. [The defendant] was never seen at the location where the marijuana was discovered, and no marijuana had ever been seen at his residence. [The defendant] made no admission that he had been at the site of the marijuana cultivation, and he was not shown to have been associated with the Bucks in past marijuana dealings. The only evidence in the affidavits concerning [the defendant] related to his prior marijuana convictions and his familial relation to the Bucks. The only evidence concerning the [defendant's] residence was that one time, four months before the search warrant was sought, Buck, Jr., said he was staying there to help harvest corn.

*Id.* The Eighth Circuit stated:

> The officers' affidavits were originally prepared to support a search-warrant application for the Buck farm. On this subject, they are focused, complete, and quite probative. By contrast, the affidavits barely touch on the [defendant's] residence or [the defendant] and then only in a way incidental to the Buck investigation. While the same affidavit can support probable cause at more than one location, here the affidavits were designed to support a search warrant for the Buck farm and applied to the [defendant's] residence as an afterthought.

*Id*. at 814-15.  Contrary to Defendant's argument, the deficiency in *Herron* is not present here.  Unlike *Herron*, the DEA's investigation into Sherrill led DEA agents to believe that when Sherrill visited Defendant, he was bringing methamphetamine to Defendant and collecting money from Defendant.  On June 5, 2025, H.M. was observed at Defendant's residence for about one hour.  After leaving Defendant's residence, H.M. was stopped and found to have 3.95 grams of methamphetamine.  There is also evidence that Defendant had a long history of drug dealing.  Accordingly, based on the drug trafficking investigation and the logical likelihood of finding useful evidence, I find that the search warrant contained a sufficient nexus between the contraband and the places to be searched identified in the warrant application.  *See Johnson*, 848 F.3d at 878; *Colbert*, 828 F.3d at 726.

In summary, based on the totality of the circumstances outlined above, and paying great deference to the issuing court's probable cause determination in the search warrant, I find that the issuing judge had a substantial basis for concluding that probable cause existed and that there was a fair probability that contraband or evidence of a crime would be found at the Defendant's residence, garage, and/or on Defendant's person. *See Reed*, 921 F.3d at 757; *Johnson*, 848 F.3d at 876; *Kail*, 804 F.2d at 444.  I also find that the requisite "nexus" between the evidence to be seized and the places to be searched was established in the search warrant.  *See Schave*, 55 F.4th at 676.  Thus, I find that there was probable cause for the search warrant, Government's Exhibit 1.  Therefore, I recommend that the motion to suppress be denied.

### 2. *Whether the* **Leon** *good faith exception applicable*

Alternatively, if the Court determines that the search warrant lacked probable cause, the *Leon* good faith exception should be applied to make the evidence inadmissible.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468

29

U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios contemplated by *Leon* apply here. There is no evidence that the affidavit in support of the search warrant contained any false statements or that the issuing magistrate judge was misled in any way. Further, there is no evidence that the issuing magistrate judge "wholly abandoned" his or her judicial role in issuing the search warrant. As discussed above, the magistrate made common sense and reasonable inferences based on the totality of the circumstances in finding that the search warrant application and affidavit were supported by probable cause. *See Kail*, 804 F.2d at 444; *Thompson*, 210 F.3d at 860. Also contrary to Defendant's assertions, as discussed above, based on the affidavit in support of the warrant application, the issuing judge had a substantial basis and made "a practical and common-sense" determination, based on the totality of the circumstances, that "a search would uncover evidence of wrongdoing" and/or contraband; and therefore, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Kail*, 804 F.2d at 444; *Maccani*, 49 F.4th at 1130; *Proell*, 485 F.3d at 431. Finally, there is no allegation or evidence that the warrant is "so facially deficient" that a police officer could not reasonably presume that the warrant was valid. Thus, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that

30

the search warrant was objectively reasonable. *See id*. Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

### 3. *Whether Defendant's cellphone is subject to the motion to suppress*

At the conclusion of the hearing, I asked defense counsel, "[I]t doesn't sound like the phone is subject to the motion to suppress. Do you agree with that Mr. Cole?" To which, Mr. Cole replied, "I do, Your Honor." (Hr'g Tr. at 62.) Nevertheless, Defendant's post-hearing brief argues, for the first time, Defendant is seeking to suppress evidence on his phone. (Doc. 38.) Defendant's Addendum to Post-Hearing Brief acknowledges that his original motion did not seek suppression of the phone, but he is nevertheless requesting suppression "and if the Court finds that was waived, he makes record that he did want to suppress Mr. Howell's [phone] to preserve any future review under *Kimmelman v. Morrison,* [477 U.S. 365 (1986)]." (Doc. 38 at 2.) The Government contends Defendant waived the argument regarding his cell phone because it was not raised in his motion or clarified at the hearing.

I find that Defendant waived arguments regarding suppression of the cell phone for the following reasons. First, my Standing Order regarding suppression hearings issued on October 22, 2020 states that "[e]very motion to suppress must include under a separate heading or attachment an Inventory of Items to be Suppressed ('Inventory'). The Inventory shall specify the physical items to be suppressed by description, date, and location." An important purpose of the inventory is to definitively establish which evidence Defendant seeks to suppress so those items can be addressed in the parties' arguments and the evidence at the hearing. Defendant's inventory references the items seized on June 7, 2025 when the search warrant was executed on Defendant's residence and person. *See* Def. Ex. A (Doc. 29-1). This inventory does not include Defendant's cellphone. Second, at the hearing, the Court specifically asked Defendant's attorney

31

whether Defendant was seeking to suppress his cellphone, to which defense counsel stated Defendant was not seeking to suppress the phone. (Hr'g Tr. at 62.) The purpose of the post-hearing brief was not to allow the parties to raise new issues not already raised in initial briefs or at the hearing. Third, as discussed above, I find that the search warrant was supported by probable cause and therefore the phone was not fruit of the poisonous tree and should not be suppressed. Fourth, I also found the *Leon* good faith exception applicable, meaning the phone should not be suppressed. Fifth, Defendant consented to the search of the phone. Other than Defendant's suggestion that that the phone was the fruit of the poisonous tree, Defendant makes no argument about the validity of his consent to search it. Based on all the foregoing, I recommend that the Court find that Defendant waived arguments regarding suppression of his cellphone. Moreover, Defendant has not established any reason for the Court to treat his cellphone differently from the other items that were seized and which I recommend not be suppressed.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 27.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to

appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 27th day of July, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

33