**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RANDALL RICHARD HOWELL,<br><br>Defendant. | No. CR26-1001-LTS-MAR<br><br>**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |

This matter is before me on a Report and Recommendation (R&R) (Doc. 40) in which the Honorable Mark A. Roberts, United States Magistrate Judge, recommends that I deny defendant Randall Howell's motion (Doc. 27) to suppress evidence. Howell has filed objections (Doc. 43).

## *I. BACKGROUND*

Howell is charged in an indictment (Doc. 3) with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). He seeks the exclusion of all evidence arising from the June 7, 2025, search of his residence and his person.

Judge Roberts held an evidentiary hearing on June 10, 2026. Doc. 36. The Government called Dubuque Police Department Investigator Chad Leitzen, Dubuque County Sheriff Deputy Adam Williams and Drug Enforcement Administration (DEA) Agent Shawn Glasel. *Id.* Judge Roberts also admitted the following exhibits:

- Government Exhibit 1 – Search warrant dated June 7, 2025 (Doc. 34-1)
- Government Exhibit 2 – Incident/Investigation report (Doc. 31-2)
- Government Exhibit 3 – Video of arrest
- Defense Exhibit C – Incident/Investigation report (Doc. 30-3)

Judge Roberts issued his R&R (Doc. 40) on July 27, 2026, and Howell filed timely objections (Doc. 43) on August 11, 2026. Trial is scheduled to begin September 21, 2026.

## *II. THE R&R*

### *A. Findings of Fact*

After including the contents of the probable cause section of the June 7, 2025, search warrant application (which I consider incorporated herein and will not repeat), Judge Roberts made the following findings of fact based on evidence presented at the hearing:

> Inv. Leitzen testified at the hearing. He has been a police officer for more than 23 years and a drug task force officer for 13 years. Much of what Inv. Leitzen testified about was included in his search warrant application. Keeping in mind that any additional or different material he testified about at the hearing was not considered by the judge issuing the warrant, I will summarize the other salient points from Inv. Leitzen's testimony:
>
> - Inv. Leitzen was aware that the investigation into James Sherrill included telephone wiretaps of calls which appeared to show Defendant was receiving methamphetamine from Sherrill. (Leitzen Hr'g Test. at 6, 30.)
> - There are approximately 1,500 traffic cameras throughout the City of Dubuque, including one pointed toward Defendant's residence which, although partially obscured, allows some observation of vehicle traffic to and from the residence. (*Id.* at 7-8.)
> - Regarding the search warrant process, Inv. Leitzen testified that the county attorney reviews and suggests edits which he incorporates before a second review. He testified that he is sworn in over the telephone by a judge and then submits the application electronically through DocuSign. (*Id.* at 9-10.) The county attorney's review of the probable cause statement takes longer than is reflected by the DocuSign timestamps. (*Id.* at 11.)

- Inv. Leitzen had previously written several hundred state search warrants. (*Id.* at 16.) In this case, the county attorney involved was Ted Enger, with whom Inv. Leitzen had previously worked. (*Id.*) Mr. Enger did not make any suggested edits to the warrant. (*Id.* at 21.) Inv. Leitzen testified, "I have had very good luck with Ted Enger, I think he's a thorough attorney, does a very good job." (*Id.* at 16.) Inv. Leitzen shared the same opinion regarding Judge Boleyn, the magistrate who signed the warrant. (*Id.* at 16-17.)
- After the warrant was signed by the magistrate, law enforcement placed surveillance on Defendant's residence while they planned the execution. (*Id.* at 12.) While conducting surveillance, Sgt. Williams conducted a traffic stop after observing Defendant leave the residence on a motorcycle. (*Id.* at 13.)
- Inv. Leitzen recorded the portion of the traffic stop he attended on his body camera. Inv. Leitzen searched Defendant and found four bags of methamphetamine in his pants pocket weighing approximately four grams. (*Id.* at 13-14.) When asked if Defendant had anything else illegal on his person, Defendant admitted he had an ounce of methamphetamine in his jacket pocket. (*Id.* at 14.) Defendant was not arrested and he was searched pursuant to the warrant and not incident to an arrest. (*Id.* at 37)
- Inv. Leitzen also found Defendant's cellphone which was downloaded by law enforcement and returned later the same day. (*Id.* at 14-15.) Prior to the download, Defendant executed a consent form to permit a search of the phone. (*Id.* at 15.) Inv. Leitzen explained that the search warrant permitted seizure of the phone, but in Dubuque County, a separate search warrant or consent was required to search the contents of a seized phone. (*Id.* at 38.)
- Pages 23-26 of Government's Exhibit 1 document the items seized from Defendant's person or his residence. (*Id.* at 17.)
- When Defendant was arrested on the warrant for the instant indictment, he was found in possession of one gram of methamphetamine. (*Id.* at 19.)
- Inv. Leitzen acknowledged that the information in the

warrant application from February 2016 was insufficient to pursue Defendant's arrest at that time. (*Id.* at 22.)

- No charges arose from the information regarding Defendant's possible involvement in drug trafficking in 2016 and 2020. (*Id.* at 22-23.)
- When H.M. was stopped after leaving Defendant's residence in June 2025, H.M. was not asked specifically about Defendant and said she had gone to Clinton. (*Id.* at 31.) H.M.'s statement was determined to be a lie based on Flock automated license plate readers that would have made a record of H.M.'s passage, if she had traveled to Clinton. (*Id.* at 32-33.) Law enforcement had not asked whether H.M. had someone else drive H.M. to Clinton.

Next, the Government called Sergeant Adam Williams. Sgt. Williams had been aware of Defendant since 2016. Sgt. Williams knew of no controlled purchases involving Defendant, but he was aware of the investigation into Sherrill, that there were wiretap calls between Defendant and Sherrill, and that law enforcement believed Defendant had received methamphetamine from Sherrill on June 6, 2025. (Williams Hr'g Test. at 40.)

On June 7, 2025, Sgt. Williams conducted surveillance of Defendant's residence at about 6:00 p.m. in preparation for the execution of the search warrant. (*Id.* at 41.) In his unmarked vehicle, Sgt. Williams followed Defendant when Defendant unexpectedly left his residence on his motorcycle. (*Id.* at 42-43.) At an intersection, Sgt. Williams observed Defendant start into the intersection while the light was still red. (*Id.*) For safety reasons, law enforcement had planned to stop Defendant if he left the residence. (*Id.* at 43.) Sgt. Williams was not initially the person designated to make the stop, but other participants in the warrant execution were occupied at the pre-execution meeting. (*Id.*) When Sgt. Williams stopped Defendant, he told Defendant that the reason for the stop was that he had started into the intersection before the light turned green. (*Id.* at 44.) Sgt. Williams was present for the search of Defendant's person, but he was not involved. (*Id.*) Defendant was permitted to return home on his motorcycle after the search of his person. (*Id.*)

Finally, the Government called to testify Agent Shawn Glasel from the Drug Enforcement Agency. Agent Glasel has been with the DEA since 2024 and was previously in law enforcement in Wisconsin. (Glasel Hr'g

Test. at 50.) Agent Glasel was investigating Sherrill, including with the use of wiretaps from May 15 through July 1, 2025. (*Id.* at 50, 57.) Agent Glasel identified Defendant speaking to Sherrill about methamphetamine distribution to Defendant. (*Id.* at 51.) Several calls and text messages indicated that Mr. Sherrill would be delivering methamphetamine to Defendant. (*Id.*)

The investigation showed that Damon Foster was receiving methamphetamine from Sherrill. (*Id.* at 51-52.) Mr. Foster was stopped after meeting with Sherrill and was found in possession of one pound of methamphetamine and a quarter pound of marijuana. (*Id.* at 52.)

Agent Glasel testified regarding information that was supplied to the Dubuque Drug Task Force as follows:

> Q. And around that same time was Mr. Sherrill in communication with Mr. Howell indicating that Mr. Howell was also going to be receiving methamphetamine?
> A. Yes.
> Q. And did you supply that information regarding Mr. Howell to the Dubuque drug task force?
> A. Yes.
> Q. And specifically on June 6, 2025, did calls and text message interception show that Mr. Howell was going to and did receive methamphetamine from Mr. Sherrill?
> A. On June 6 it was plans between Mr. Sherrill and Mr. Howell for Mr. Sherrill to meet with Mr. Howell, they didn't specifically talk about receiving methamphetamine.
> Q. Based on the prior investigation, did you believe, though, that it was likely that Mr. Sherrill was delivering to him?
> A. Yes.

(*Id.* at 52-53.)

While the warrant application did not mention the wiretap, the calls were known to law enforcement. (*Id.* at 53.) The wiretap information was not included in the warrant application to protect the on-going investigation because law enforcement was concerned the warrant might not be sealed. (*Id.* at 54.) Inv. Leitzen was instructed not to include information about the wiretap in the warrant application to protect the investigation and because of safety concerns. (*Id.* at 56.) Defendant's phone was not subject

> to the wiretap; however, the calls between Defendant and Sherrill were intercepted from the wiretap of Sherrill's phone. (*Id.* at 55.)

Doc. 40 at 10-14 (footnotes omitted).

### *B. The Parties' Arguments*

Howell argues the search warrant was not supported by probable cause because it relies on stale information, vague statements from confidential sources, and "ambiguous visits" by Sherrill. He also argues the warrant failed to establish a nexus between criminal activity and the residence. The Government argues the warrant was supported by probable cause and makes sufficient links to criminal activity and Howell's residence. The Government argues that in the absence of probable cause, the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984), applies. It also argues that evidence from the traffic stop is admissible because, even if not supported by the warrant, it was supported by probable cause based on other information known by law enforcement.

Finally, there is a dispute concerning the suppression of Howell's cell phone. The Government argues Howell waived this argument because his cell phone was not listed on his inventory or items he sought to suppress. Howell argues that his cell phone was fruit of the poisonous tree and that any subsequent consent he may have given to its search does not purge the taint.

### *C. Recommendations*

Judge Roberts recommends denying the motion to suppress. He concluded the search warrant affidavit contained the following 19 facts that supported the magistrate's finding of probable cause:

> 1. Leitzen's communication in February 2016 with an informant who identified Howell as a methamphetamine dealer, noting his residence and Howell's practice of having methamphetamine buyers stay at his home for 30 minutes or more to avoid the appearance of short-term traffic at his house.

2. Leitzen's proffer interview with M.A. in September 2020, in which M.A. identified Howell as a methamphetamine dealer, noting his residence and that he sold one pound of methamphetamine per week.

3. Leitzen's August 2024 interview with K.K., a large-scale methamphetamine supplier, who identified Howell as a methamphetamine dealer and stated she provided Howell with one quarter pound to one half pound of methamphetamine weekly.

4. Leitzen's May 2025 communication with a confidential source (CS) who identified Howell's residence and stated that Howell had been established in the methamphetamine trade in Dubuque for decades.

5. The DEA's May 2025 investigation into Sherrill, which included several controlled purchases of methamphetamine from Sherrill amounting to approximately 181 grams of methamphetamine.

6. Observations by DEA agents on May 22, 2025, in which Sherrill met with his source and obtained what agents believed was a large quantity of methamphetamine and later met with D.F., who was stopped by law enforcement after leaving Sherrill's home and a search of his vehicle yielded approximately 464 grams of methamphetamine which D.F. stated he obtained from Sherrill.

7. Leitzen's conversation with a confidential informant (CI) who told him that C.A., a methamphetamine dealer in Dubuque, obtained his methamphetamine from Sherrill.

8. The DEA confirmed that Sherrill was in regular contact with C.A. and also noted that Sherrill was in regular contact with Howell.

9. On May 16, 2025, Leitzen confirmed for the DEA, using Dubuque camera traffic footage, that Sherrill pulled into the alley behind Howell's residence and turned into Howell's driveway at 8:28 p.m. and stayed until 9:10 p.m.

10. On May 23, 2025, Glasel told Leitzen that he believed Sherrill planned to meet with Howell at Howell's residence and drop off a significant amount of methamphetamine and collect money from Howell around midnight.

11. On May 24, 2025, at 12:19 a.m., Leitzen conducted physical surveillance on Howell's residence and observed Sherrill pull into Howell's driveway at 12:27 a.m. and leave Howell's residence at 1:24 a.m.

12. On May 29, 2025, Glasel told Leitzen that Sherrill was expected to drop off a large quantity of methamphetamine to Howell late that evening or early the next morning, and on May 30, 2025, traffic camera footage showed that Sherrill pulled into Howell's driveway at 12:15 a.m. and left at 1:33 a.m.

13. On June 5, 2025, Investigator Nick Soppe of the DDTF observed H.M. at Howell's residence, where she stayed for about one hour, after leaving Howell's residence, H.M. was stopped and a bag with 3.95 grams of methamphetamine was found on H.M.'s person.

14. H.M. stated that she obtained the methamphetamine in Clinton, but the automated license plate reader system showed that H.M.'s vehicle had not left Dubuque or gone anywhere in Clinton on June 5, 2025.

15. In Leitzen's training and experience, drug users often provide inaccurate information to law enforcement when questioned to protect their drug source.

16. On June 6, 2025, the DEA informed Leitzen that Sherrill would be meeting Howell at Howell's residence to drop off methamphetamine and collect money.

17. Leitzen conducted physical surveillance on Howell's residence and observed Sherrill pull into Howell's driveway at 11:14 p.m. and leave at 12:10 a.m.

18. DEA phone tolls on May 15, May 24, May 30, and June 6, 2025, showed that Howell and Sherrill engaged in phone communication with each other.

19. In Leitzen's training and experience, drug dealers often travel at night to conceal their criminal activities and that it is unlikely that meetings lasting an hour or less in the middle of the night are social visits, especially since it is a three hour round trip between Sherrill's home and Howell's

> residence, making it "extremely likely that drugs and/or money were exchanged on each of Sherrill's visits to Howell's residence.

Doc. 40 at 22-25. Considering the above information and giving deference to the magistrate's probable cause determination, Judge Roberts concluded the search warrant was supported by probable cause. *Id.* at 25.

With regard to the alleged staleness of certain facts, Judge Roberts concluded the information from 2016, 2020 and 2024 had to be taken together with the information from May and June 2025 that Sherrill was frequenting Howell's residence for short periods of time in the middle of the night. *Id.* at 26. He reasoned this historical context did not make the warrant affidavit stale because the affidavit also provided and focused on information relating to an ongoing drug conspiracy over a period of weeks. *Id.*

With regard to the nexus argument, Judge Roberts discussed *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000), and whether the inference that Sherrill's visits to Howell's residence involved drugs (and that drugs or evidence would be at Howell's residence) was enough to establish probable cause. He distinguished *Herron*, noting that in this case, the DEA's investigation into Sherrill led agents to believe that when Sherrill visited Howell, he was bringing methamphetamine to him and collecting money from him. There was also evidence concerning H.M.'s possession of 3.95 grams of methamphetamine after leaving Howell's residence and Howell's long history of drug dealing. Therefore, he concluded the search warrant provided a sufficient nexus between the contraband and the places to be searched. Because he concluded there was probable cause for the search warrant, he recommends the motion to suppress be denied.

Next, Judge Roberts considered the *Leon* good faith exception and concluded that none of the four scenarios in which it would not be objectively reasonable for an officer to rely on a warrant issued by a magistrate were present. *Id.* at 30. He concluded that "law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable." *Id.* at 30-31.

As such, he made an alternative recommendation that Howell's motion to suppress be denied under the *Leon* good faith exception.

Finally, Judge Roberts considered whether Howell's cell phone was subject to the motion to suppress. He concluded that Howell waived arguments concerning suppression of the cell phone because:

- his standing order regarding suppression hearings states that "[e]very motion to suppress must include under a separate heading or attachment an Inventory of Items to be Suppressed" and that "[t]he Inventory shall specify the physical items to be suppressed by description, date, and location" and Howell did not include his cell phone in his Inventory (Doc. 29-1)

- Judge Roberts specifically asked defense counsel whether Howell was seeking to suppress his cell phone and counsel answered that he was not. Doc. 44 at 65.

- The search warrant was supported by probable cause and therefore the phone was not fruit of the poisonous tree.

- The *Leon* good faith exception is applicable, meaning the phone should not be suppressed.

- Howell consented to the search of his phone and makes no argument about the validity of his consent.

*Id.* at 31-32.

## *III. STANDARD OF REVIEW*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also

> receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## *IV. DISCUSSION*

### *A. Howell's Objections*

Howell makes the following objections:

- The four corners of the affidavit failed to establish probable cause to support a search of Howell's residence due to insufficient nexus, conclusory assertions and stale information

- Judge Roberts improperly relied on (or was influenced by) extrinsic hearing testimony outside the four corners

- Even if probable cause is borderline, the *Leon* good faith exception does not apply

- Staleness of the pre-2025 information

- If the court sustains objections to the warrant and requires suppression of items at Howell's residence, the court should exercise its discretion to address the merits of the cellphone and March 10 seizure.[1]

Doc. 43. I will address the objections related to probable cause first, followed by the objections to application of the *Leon* good faith exception and suppression of Howell's cell phone.

### *B. Analysis*

#### *1. Probable Cause Analysis*

Howell argues Judge Roberts erred in concluding that the search warrant was supported by probable cause because he considered information outside the four corners of the affidavit. Howell argues the affidavit establishes only: (1) multiple late-night visits by Sherrill (a known methamphetamine distributor under DEA investigation) to Howell's residence lasting 42 to 78 minutes; (2) phone contact between Sherrill and Howell preceding those visits; (3) one visitor (H.M.) who left the residence with 3.95 grams of methamphetamine and lied about her source; and (4) the affiant's training and experience assertions that such visits "are extremely likely" drug/money exchanges and that drug dealers keep paraphernalia at home. He argues the fact that the affidavit repeatedly relies on the DEA investigation without providing underlying facts, observations or controlled buys involving Howell or other corroboration of actual drug activity at Howell's residence is insufficient to establish probable cause. He continues to rely on *Herron* and

[1] *See* Doc. 30-3 (stating that Howell was arrested on March 10, 2026, on a warrant related to this case and found in possession of 1.31 grams of methamphetamine).

also cites *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), another case addressing a similar deficiency in the probable cause analysis.

Judge Roberts thoroughly addressed *Herron*. Doc. 40 at 27-28. I agree with his conclusion that this case does not contain the same deficiency of failing to tie the defendant or his residence to the alleged criminal activity. There was evidence connecting Howell and his residence to drug activity – including the late night visits from Sherrill, H.M.'s possession of methamphetamine after leaving Howell's residence and Howell's history of drug dealing from his residence as provided through various informants. Howell does not make any arguments in his objections that Judge Roberts did not consider.

With regard to *Colbert*, the defendant in that case argued the search warrant application failed to establish a nexus between the defendant's residence and money laundering activity. *Colbert*, 828 F.3d at 726. The court disagreed, noting the affidavit included information from two witnesses who had engaged in transactions with the defendant in the past and another who had been present when the defendant sold cocaine to other individuals. *Id.* It also included intercepted phone calls in which the defendant coordinated cocaine sales and provided information that the defendant owned several expensive cars, frequently wore expensive jewelry and was renovating the house where he lived, despite the fact he had not filed taxes in several years and had no apparent legitimate source of income. *Id.* Howell argues that unlike *Colbert*, there are no witness accounts of drug transactions occurring inside or immediately outside the residence, no intercepted communications in which Howell coordinated sales from or storage at the house, no observations of packaging materials, scales, large quantities of cash, or other trafficking indicators at the location and no controlled purchase tied to the premises.

*Colbert* does not suggest that more was required to establish probable cause in this case. While there were no intercepted communications in this case, the affidavit provided information that prior to each of the meetings between Sherrill and Howell, they engaged in phone communication with each other. Doc. 34-1 at 13. The affidavit also provided

information about Sherrill's and Howell's drug activity. As to Sherrill, the affidavit noted that the DEA has conducted a number of controlled purchases of methamphetamine from Sherrill over the past several months netting approximately 181.4 grams of methamphetamine. *Id.* at 10. The affidavit also described an instance in which DEA investigators observed Sherrill meet with his source of supply in Des Moines, Iowa, on May 22, 2025, and returned to his residence, where he met with another subject. Law enforcement performed a traffic stop on this subject's vehicle, which yielded approximately 464.5 grams of methamphetamine that the subject admitted he had acquired from Sherrill. *Id.*

With regard to Sherrill's connection to Howell, the affidavit describes that phone records revealed that Sherrill was frequently in communication with two different people in Dubuque (Howell and another individual, whom a confidential informant (CI) identified as the CI's main source of supply for methamphetamine and stated that his supplier, in turn, was Sherrill). *Id.* at 11. Howell's connection to drug activity and, specifically, drug activity at his residence, was established by several means. Historically, Leitzen provided information from multiple sources that Howell was a methamphetamine dealer. *Id.* at 9-10. Three sources provided information regarding Howell's residence. One source described where Howell kept his methamphetamine in the house and that Howell had a practice of making buyers stay for a half hour to an hour before leaving his house because he did not want it to look like he had a lot of short-term traffic at his house. *Id.* at 9.

While this information dated back to 2016 (with the earliest information obtained in May 2025), Howell's continued drug activity was corroborated by more recent information and actions. This included not only Sherrill's visits to Howell's residence on May 15, May 24, May 30 and June 6, (which were consistent with the report that Howell required drug-associated visitors to stay at least a half hour) but also a traffic stop of another visitor, who was in possession of 3.95 grams of methamphetamine after leaving Howell's residence. While this visitor stated she acquired it from an unknown

person in Clinton earlier that day, a check of an automated license plate reader did not show that her vehicle had traveled outside of Dubuque or anywhere in Clinton on that date. *Id.* at 12. Taken together, the information in the affidavit establishes a fair probability that evidence of drug trafficking would be found at Howell's residence, which is all that is required to establish probable cause. *See United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) ("Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'").

Howell's other arguments concerning the probable cause analysis are without merit. First, he argues Judge Roberts relied on (or was influenced by) extrinsic hearing testimony outside the four corners of affidavit. This testimony included information about wiretaps of Sherrill's phone and the decision to omit that information from the affidavit to protect the investigation and agents' contemporaneous beliefs based on those intercepts. Howell admits the R&R acknowledges that this material was not considered by the judge issuing the warrant, but he argues the R&R repeatedly leans on the affidavit's references to the DEA investigation, which was grounded in the omitted wiretap evidence.

I disagree with the contention that Judge Roberts considered information outside the affidavit in analyzing whether there was probable cause. As Howell notes, the affidavit itself repeatedly references the DEA investigation. The affidavit describes the relevant information obtained from that investigation, but does not describe how such information was obtained. For instance, Glasel reported to Leitzen when he believed Sherrill would be driving to Howell's residence to drop off methamphetamine. This was "based on the DEA investigation." Doc. 34-1 at 13. Leitzen would then conduct surveillance on Howell's residence to corroborate information Glasel had provided. While the affidavit does not describe how Glasel came to know such information, the issuing judge did not need to know those details to find there was probable cause, as the reliability of the information was verified through Leitzen's subsequent surveillance. Nor did Judge Roberts improperly consider where that information came from in analyzing

whether the warrant was supported by probable cause. While Leitzen's knowledge of external facts is relevant to the good faith exception (discussed below), there is no indication that it was considered in the R&R's probable cause analysis. The 19 points relied on by Judge Roberts all come from the affidavit and do not reference additional information about the DEA investigation outside of what was provided in the affidavit.

Second, Howell argues that the 2016, 2020 and 2024 tips are stale. He argues the tips from 2016 and 2020 are not adequately refreshed by the 2025 surveillance, which consists primarily of visits by Sherrill and one departing visitor found with a small quantity of methamphetamine. He argues this differs from cases such as *Colbert* in which there was concrete, ongoing residence-specific activity that sustained older information. The tip from 2016 was that Howell was a methamphetamine dealer in Dubuque. The source of the information was a methamphetamine user who identified Howell's residence, described where in the residence Howell kept methamphetamine that was bagged up for sale, stated that Howell usually had one to two ounces of methamphetamine on hand at any time and described Howell's practice of making buyers stay for a half hour to an hour before leaving so it did not appear as if he had a lot of short-term traffic at his house. The 2020 tip involved a proffer interview of an individual who agreed to talk about people she knew to be involved in the delivery of methamphetamine. She identified Howell as a methamphetamine dealer and described the area of his residence, stating that he sold about one pound of methamphetamine per week and that she had bought methamphetamine from Howell about six to eight months prior to the interview but no longer got along with him because Howell did not like her boyfriend. These tips, taken alone, would not support a search warrant for Howell's residence in June 2025. However, the affidavit provided more recent information concerning suspected drug activity at Howell's residence. This information, including Sherrill's four late-night visits to Howell's residence and the individual who was found in possession of methamphetamine shortly after leaving Howell's residence, was consistent with the information provided in 2016 and 2020 (including the length of visits, the location of

Howell's residence and the suspected presence of methamphetamine at Howell's residence given Sherrill's known dealings in methamphetamine and the other individual's possession of 3.95 grams of methamphetamine after leaving Howell's residence where she had stayed for approximately one hour). "Where the crime under investigation is 'of a continuous nature,' the passage of time between the last described act and the application for a warrant is less significant." *United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019). I agree with Judge Roberts that when considered with the information from May and June 2025, the information from 2016, 2020 and 2024 was not stale such that the warrant failed to establish probable cause when it was issued.

In sum, I find the search warrant affidavit established probable cause to search Howell's residence. Howell's arguments attempt to impose a higher burden as to the nexus and probable cause requirements that are not supported by the law. *See United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999) ("The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence."); *United States v. Skarda*, 845 F.3d 370, 376 (8th Cir. 2016) (noting the issuing judge "must make a 'common-sense decision' based on the totality of the circumstances set forth in the affidavit as to whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"); *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006) (noting if an affidavit in support of a search warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" probable cause has been established). Howell's objections related to probable cause are overruled.

### *2. Leon Good Faith Exception*

Relying on *Herron*, Howell argues that the *Leon* good faith exception does not apply. He argues the affidavit did not establish any direct link between drugs and the residence beyond inference from visits by a suspected supplier. He also attempts to

distinguish this case from *United States v. Proell*, 485 F.3d 427 (8th Cir. 2007), in which the court applied the good faith exception despite an insufficient nexus because the affidavit included concrete facts showing the defendant's access to and presence on neighboring properties tied to the suspected activity. Howell contends the affidavit relied on historical characterizations of Howell as a distributor, telephone contact with a known supplier, several short nighttime visits from that supplier and a single departing visitor later found with a small quantity of methamphetamine. He characterizes this evidence as mere association and opportunity rather than on-site observations that could be reasonably relied on by officers. He also argues that the deliberate omission of the strongest evidence (the wiretaps) means the officers cannot claim reasonable reliance on the resulting, allegedly weak affidavit.

Judge Roberts noted that *Leon* identified four scenarios in which it is not objectively reasonable for the executing officer to rely on a search warrant:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Proell*, 485 F.3d at 431 (citing *Leon*, 468 U.S. at 923); *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)). Notably, none of these scenarios include deliberately withholding other relevant information (for safety concerns or otherwise). Indeed, "[i]n assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (citing *United States v. Chambers*, 987 F.2d 1331, 1335 (8th Cir. 1993)). Leitzen had knowledge of the wiretaps and was instructed not to include this information in the affidavit (1) to protect the integrity of the DEA investigation and (2) based on safety

concerns related to Sherrill. *See* Doc. 44 at 56-57, 59. It was reasonable for Leitzen and the other officers to rely on the warrant as Howell has not established any of the four above-listed scenarios. Howell's objections related to the good faith exception are overruled.

### *3. Cell Phone and March 10 Seizure of Methamphetamine*

Because I have concluded the affidavit for the search warrant established probable cause, I need not consider Howell's arguments regarding whether (1) he preserved the issue concerning the cell phone's suppression and (2) could challenge the seizure of 1.3 grams of methamphetamine found on his person at the time of his arrest on March 10, 2026. *See* Doc. 43 at 9 (acknowledging that objections related to suppression of Howell's cell phone and March 10 seizure of methamphetamine are largely moot if the court decides that probable cause supports the warrant). Howell's objections concerning these items are overruled.

## *V. CONCLUSION*

For the reasons set forth herein:

1. Howell's objections (Doc. 43) to the Report and Recommendation (Doc. 40) are **overruled** and I **accept** the Report and Recommendation without modification.

2. Pursuant to the Report and Recommendation, Howell's motion (Doc. 27) to suppress evidence is **denied**.

**IT IS SO ORDERED** this 19th day of August, 2026.

Leonard T. Strand
United States District Judge